1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

11  TIM and PENNY PATERSON,

12                              Plaintiffs,                    No.  C05-1719Z

13  v.

14  LITTLE, BROWN AND COMPANY, TIME                           ORDER
    WARNER BOOK GROUP, HAROLD
15  EVANS ASSOCIATES LLC, HAROLD
    EVANS, and DAVID LEFER,

16                              Defendants.

17  _____

18        This matter comes before the Court on Motion for Summary Judgment, docket no. 13,

19  by Defendants Little, Brown & Co. ("Little Brown"), Time Warner Book Group ("Time

20  Warner"), Harold Evans Associates LLC ("Harold Evans Associates"), Sir Harold Evans,

21  and David Lefer (collectively "Defendants").  The Court has considered the Defendants'

22  Motion for Summary Judgment, docket no. 13, Plaintiffs' Response, docket no. 20,

23  Defendants' Reply, docket no. 22, and the various supporting declarations and exhibits filed

24  by the Parties.  The Court heard Oral Argument on Monday, July 2, 2007, and took the

25  matter under advisement.  The Court now being fully informed hereby GRANTS the

26

ORDER   1–

1  Defendants' Motion for Summary Judgment, docket no. 13, and dismisses Plaintiffs'
2  Complaint.

3      In 2004, Little Brown & Co.[1] published a series of essays on American inventors and
4  innovators.  The essays were written by Sir Harold Evans, and the book was titled They
5  Made America: From the Steam Engine to the Search Engine: Two Centuries of Innovators.
6  Among its profiles of American inventors, the book included a chapter titled "Gary Kildall:
7  He saw the future and made it work.  He was the true founder of the personal computer
8  revolution and the father of PC software."  Das Decl., docket no. 14, Ex. B (the "Kildall
9  chapter").  The Kildall chapter details the life and work of Gary Kildall, a pioneer in
10  personal computing, and focuses on his creation of the CP/M microcomputer operating
11  system in the 1970s.  In recounting the significance of Kildall's life and work, and noting his
12  role as the "father of PC Software," the book considers Bill Gates, Microsoft, the MS-DOS
13  operating system, and their relation to Kildall's CP/M operating system.

14      Plaintiff Tim Paterson created an early computer operating system called "QDOS," or
15  "86-DOS," that would ultimately be purchased by Microsoft and sold by IBM as "PC-DOS,"
16  and by Microsoft as "MS-DOS," or simply "DOS."  At issue in this defamation case is
17  Evans' discussion of Paterson's reliance on CP/M in creating DOS.  Evans contends, in the
18  Kildall chapter, that Paterson "[took] a ride on" Kildall's operating system, appropriated the
19  "look and feel" of the CP/M operating system, and copied much of his operating system
20  interface from CP/M.  Das Decl., docket no. 14, Ex. B at 412-13.

21      Paterson contends that statements in the book are false and defamatory.  See Compl.,
22  docket no. 1, ¶ 1.5.  Paterson also asserts a claim for false light invasion of privacy based on
23  the book's allegedly false statements.  Id. ¶¶ 2.1-2.4.

24

25

26  ─────────────────
   [1] Little, Brown & Co. is an imprint of Time Warner Book Group.

ORDER  2–

**A.** **Background: CP/M, QDOS, 86-DOS, and MS-DOS**

In 1973, Gary Kildall created CP/M, which stood for "Control Program/Monitor." CP/M was an operating system for microcomputers. In 1974, Kildall founded Intergalactic Digital Research (shortened to Digital Research, Inc., or DRI) to sell his operating system. Das Decl., docket no. 14, Ex. C (John Markoff, Gary Kildall, 52, Crucial Player In Computer Development, Dies, N.Y. Times, July 13, 1994, at D19). By the late 1970s, CP/M had become the standard operating system for the first generation of 8-bit microcomputers, including Intel's 8-bit chip, the 8080, and a competing 8-bit chip, the Zilog Z80. Id., Ex. C, Ex. E (Tim Paterson, The Right Place . . . The Right Time, at 33 (unpublished)).

In 1978, Intel introduced its 16-bit chip, the 8086. Das Decl., docket no. 14, Ex. F (Microsoft Press, The MS-DOS Encyclopedia, at 11 (Ray Duncan ed. 1988)). While working at Seattle Computer Products in 1979, Paterson designed a central processing unit ("CPU") card that incorporated the Intel 8086 chip. Id. at 12. During this period, Digital Research was developing a 16-bit version of CP/M, generally referred to as CP/M-86, designed to run on the Intel 8086. However, CP/M-86 was still unavailable in April 1980, and Seattle Computer Products decided to develop its own 16-bit operating system.

> Both Paterson (working on QDOS) and Rod Brock knew that a standard operating system for the 8086 was mandatory if users were to be assured of a wide range of application software and languages. CP/M had become the standard for 8-bit machines, so the ability to mechanically translate existing CP/M applications to run on a 16-bit system became one of Paterson's major goals for the new operating system. To achieve this compatibility, the system [Paterson] developed mimicked CP/M-80's functions and command structure, including its use of file control blocks (FCBs) and its approach to executable files.

Id. at 12. At the same time, however, Paterson rejected CP/M's system for file allocation, which was inefficient for large disks, and instead used a file allocation table ("FAT"), as Microsoft had done with its own M-DOS and stand-alone disk BASIC. Id. at 13.

ORDER   3–

Paterson and Seattle Computer Products ("SCP") proceeded with development in two phases. First, Paterson developed a "quick and dirty operating system," nicknamed "QDOS," to fill the immediate need for SCP's computer. Paterson Decl., docket no. 20-4, ¶ 4. Second, Paterson worked to create a "much more refined operating system" that would ultimately be made available in single-user and multi-user versions. Id. Paterson's primary objective for his version of DOS was to make it "as easy as possible for software developers to write applications for it . . . ." Id. ¶ 5. He therefore developed an application program interface ("API") that was compatible with CP/M, and enabled the automatic translation of 8-bit programs into 16-bit programs. Id. Translation compatibility was the "primary design requirement" in Paterson's development of an operating system for the 8086. Id. ¶ 6.

**1.    Translation Compatibility.**

In order for Paterson's DOS to be "translation compatible" with Kildall's CP/M, the numbers assigned to any given function, the registers used to pass data, and the memory structures used to pass information all needed to be identical as between DOS and CP/M. See Das Decl., docket no. 14, Ex. A (Paterson Dep. at 50:25 - 51:5). For Paterson, "[s]tep one was to write down what CP/M-80 did." Das Decl., docket no. 14, Ex. L (David Hunter, Tim Paterson: The Roots of DOS, Softalk for the IBM Computer, March 1983). Translation compatibility allowed programs for Intel's 8080, which ran on CP/M, to run under DOS:

> "Once you translated these programs, my operating system would take the CP/M function after translation and it would respond in the same way," said Paterson. "To do this did not require ever having CP/M. It only required taking Digital's manual and writing my operating system. And that's exactly what I did. I never looked at Kildall's code, just his manual."

Das Decl., docket no. 14, Ex. G (James Wallace & Jim Erickson, Hard Drive: Bill Gates and the Making of the Microsoft Empire 185 (John Wiley & Sons, Inc. 1992)).

In a letter to the editor of Microprocessor Report in 1994, Paterson further described the relationship and compatibility between CP/M and DOS, and his reasons for ensuring compatibility between the two:

ORDER  4–

SCP was a small company with no clout in the industry.  To get major software developers to port their products from the 8080/Z80 to the 8086, I decided we had to make it as easy as possible.  I had already written a Z80-to-8086 source code translator (hosted on the 8080 and CP/M).  My plan was that running an 8080 CP/M program through the translator would be the only work required by software developers to port the programs to the 8086.  In other words, the interface used by the applications to request operating system services would be exactly the same as CP/M's after applying the translation rules.

So 86-DOS generally had all the same application-visible elements as CP/M–the function codes, the entry point address, part of the File Control Block layout, etc.  I used the 1976 CP/M Interface Guide for my description of the requirements.  I also provided some similar commands from the console such as DIR, RENAME, ERASE--although any system would have such functions, regardless of name chosen.

Das Decl., docket no. 14, Ex. J (Tim Paterson, <u>The Origins of DOS: DOS Creator Gives His View of Relationship Between CP/M, MS-DOS</u>, Microprocessor Report, Oct. 3, 1994, Letter to the Editor).  Paterson's DOS was designed to mimic CP/M-80 in both "functions available and style of operation":

[t]he structures of 86-DOS's file control blocks, program segment prefixes, and executable files were nearly identical to those of CP/M-80.

Das Decl., docket no. 14, Ex. D (Ray Duncan, <u>Advanced MS-DOS Programming</u> 4 (Microsoft Press 1986)).[2]

**2.    Controversy and Commentary.**

Even before IBM unveiled the IBM Personal Computer, the industry began to note similarities between DOS and CP/M.  Infoworld commented in 1981, even before the release

---

[2] One district court has commented on the relationship between QDOS and CP/M in the context of litigation between Caldera, Inc. and Microsoft.

In 1981, Microsoft first licensed and later purchased for a reported $50,000 a 16-bit CP/M clone from Seattle Computer Products, a small original equipment manufacturer (OEM). This system, named QDOS (Quick and Dirty Operating System), mirrored the functionality of CP/M.

<u>Caldera, Inc. v. Microsoft Corp.</u>, 72 F. Supp. 2d 1295, 1298 (D.Utah 1999).  However, the commentary was not a factual finding, but merely background for the parties' dispute over DR DOS, MS-DOS, and Microsoft's business practices.  The above quotation from the opinion included no citation to the record.

ORDER   5–

1  of the IBM PC, that the operating system for IBM's new computer "will be similar to CP/M

2  in many respects."  Das Decl., docket no. 14, Ex. S (InfoWorld Staff, IBM to Pounce on

3  Micro Market, June 8, 1981).  In the years that followed, however, commentary on

4  Paterson's DOS would become increasingly critical, with regard to its similarities with

5  CP/M.  As evidence of an ongoing public debate over the so-called "paternity" of DOS,

6  Defendants cite various authors and commentators, as well as writings by Gary Kildall and

7  Tim Paterson.

8  ■  DOS was a "a CP/M-look-alike operating system."  Das Decl., docket no. 14, Ex. U (Kevin Strehlo, <u>Microsoft Expands, Weighs Dependence Against Autonomy</u>, PC Week, Sept. 1984).

9

10  ■  "The operating system that Gates and Microsoft developed for IBM was modelled [sic] on CP/M," and QDOS "retained many of the basic features of CP/M."  "Some of the most annoying aspects of DOS, such as the eight-character file name limit, the silent A>, and the lack of any confirmation upon erasing a file, are direct imports from CP/M."  <u>Id.</u>, Ex. V (Randy Dykhuis, <u>DOS 4.0: Time to Upgrade?</u>, Computers in Libraries, June 1990).

11

12

13

14  ■  "Paterson set out to clone CP/M.  The result was what he called QDOS—Quick and Dirty Operating System."  <u>Id.</u>, Ex. H (Stephen Manes & Paul Andrews, <u>Gates: How Microsoft's Mogul Reinvented an Industry-and Made Himself the Richest Man in America</u> 157-58 (Doubleday 1993)).

15

16  ■  "MS-DOS itself started out as a clone of the CP/M operating system from DRI."  "Somewhat understandably, Digital Research was upset when it found that Microsoft s new operating system for the IBM PC was a clone of CP/M."  "There is no question about MS-DOS's large-scale borrowing from CP/M."  "So MS-DOS began life as an enhanced clone of CP/M."  <u>Id.</u>, Ex. I (Andrew Schulman et al., <u>Undocumented DOS: A Programmer's Guide to Reserved MS-DOS Functions and Data Structures</u> 181-82 (Addison-Wesley 1994)).

17

18

19

20  ■  "Through all of this, Kildall remained the gentleman.  He repeatedly declined to follow the advice of those who would have him act against Microsoft despite the tales that the Redmond giant had infringed on his patents, or that it had borrowed a bit too heavily from CP/M's code in the beginning."  <u>Id.</u>, Ex. X (Wayne Rash Jr., <u>A Requiem for the Father of Modern Operating Systems</u>, InternetWeek, July 25, 1994).

21

22

23

24  ■  "Tim Paterson had written a program called QDOS that Kildall always believed was copied largely from CP/M.  While Paterson has strongly denied those allegations, such practices were fairly common at the time."  <u>Id.</u>, Ex. Y (Rory J. O'Connor, <u>Farewell to Troubled Genius: Kildall's Work Overshadowed by Rival</u>, San Jose Mercury News, July 31, 1994, at 1A).

25

26

ORDER  6–

- QDOS "was pretty much a CP/M clone, but it ran on the 16-bit 8086 CPU." Id., Ex. Z (Stan Veit, Whatever Happened To . . . Gary Kildall? CP/M Disk Operating System Developer, Computer Shopper, Nov. 1994).

- "QDOS, which stood for 'quick and dirty operating system,' was a 16-bit clone of CP/M intended for an 8086-based computer being developed by the small company. All QDOS commands were the same as in CP/M. Paterson admitted to a little 'low-level borrowing' from CP/M, too, but claimed that most of the code was his own." Id., Ex. AA (Robert X. Cringley, Accidental Empires at 133 (Harper Business 1996 ed.)).

- QDOS "was an obvious CP/M knockoff . . . . Paterson admitted that he had written QDOS with a CP/M manual at his side, intentionally mimicking key components to ease the task of developers accustomed to its popular predecessor (while at the same time improving on the original)." Id., Ex. BB (Gary Rivlin, The Plot to Get Bill Gates 34 (Time Books 1999)).

- "Paterson's SCP-DOS operating system was a close but crude imitation of CP/M." Id., Ex. CC (Paul Freiberger & Michael Swaine, Fire in the Valley 334 (McGraw Hill 2d ed. 2000)).

- "Q-DOS was basically a rip-off of Kildall's CP/M, but Kildall had never gotten around to suing." Id., Ex. DD (Garrett Romaine, Two Books on Silicon Valley, Technical Communications, Feb/Mar. 2000, at 111).

Paterson has publicly responded on various occasions to allegations that DOS was a "copy" or a "clone" of CP/M, arguing that he never viewed Kildall's source or binary code during his creation of DOS. He has written articles and features regarding his work on DOS.

Paterson was quoted in an article for Softalk in March 1983, where he described his approach to writing DOS. Das Decl., docket no. 14, Ex. L (David Hunter, Tim Paterson: The Roots of DOS, Softalk for the IBM Computer, March 1983).

"Step one was to write down what CP/M-80 did. Step two was to design a file system that was fast and efficient."

Id., Ex. L (quoting Paterson). Paterson also was quoted on design decisions made for DOS, with regard to CP/M:

"IBM wanted CP/M prompts. It made me throw up." But when IBM asks, you comply if you're a lowly programmer, and that is what Paterson did.

Id., Ex. L (quoting Paterson). Mr. Paterson wrote an article for Byte magazine regarding the origins of DOS. See Das Decl., docket no. 14, Ex. K (Tim Paterson, An Inside Look at

ORDER  7–

MS-DOS: The Design Decisions Behind the Popular Operating System, Byte, June 1983).

Paterson commented:

> The primary design requirement of MS-DOS was CP/M-80 translation compatibility, meaning that if an 8080 or Z80 program for CP/M were translated for the 8086 according to Intel's published rules, the program would execute properly under MS-DOS.

Id. at 230.  Mr. Paterson was interviewed by the authors of Hard Drive: Bill Gates and the Making of the Microsoft Empire, who reported that Paterson said:

> "Once you translated these programs, my operating system would take the CP/M function after translation and it would respond in the same way," said Paterson.  "To do this did not require ever having CP/M.  It only required taking Digital's manual and writing my operating system. And that's exactly what I did.  I never looked at Kildall's code, just his manual."

Das Decl., docket no. 14, Ex. G, at 185.  Paterson also described a telephone conversation in which Kildall accused him of ripping off CP/M:

> "At the time," said Paterson, "I told him I didn't copy anything.  I just took his printed documentation and did something that did the same thing.  That's not by any stretch violating any kind of intellectual property laws.  Making the recipe in the book does not violate the copyright on the recipe.  I'd be happy to debate this in front of anybody, any judge."

Id., Ex. G, at 184 (quoting Tim Paterson).

## DISCUSSION

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the opposing party must show that there is a genuine issue of fact for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The opposing party must present significant and probative evidence to support its claim or defense.  Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

ORDER   8–

1    In order to defeat a motion for summary judgment, the non-moving party must make

2   more than conclusory allegations, speculations, or argumentative assertions that material

3   facts are in dispute.  <u>Wallis v. J.R. Simplot Co.</u>, 26 F.3d 885, 890 (9th Cir. 1994).  Moreover,

4   in ruling on a motion for summary judgment, the Court may only consider evidence that

5   would be admissible at trial, and may not consider inadmissible hearsay.  <u>Key Bank of Puget</u>

6   <u>Sound v. Alaskan Harvester</u>, 738 F. Supp. 398, 401 (W.D. Wash. 1989).  For purposes of

7   summary judgment, reasonable doubts as to the existence of material facts are resolved

8   against the moving party and inferences are drawn in the light most favorable to the opposing

9   party.  <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000).  However, where

10   no *factual* showing is made in opposition to a motion for summary judgment, the district

11   court is not required to search the record *sua sponte* for some genuine issue of material fact.

12   <u>See</u> <u>Carmen v. San Francisco Unified School Dist.</u>, 237 F.3d 1026, 1029 (9th Cir. 2001).

13   **A.    Defamation**

14    Competing interests underlie all defamation cases: the protections of the First

15   Amendment compete with the protection of an individual's reputation under State

16   defamation law.  The tension has been described as follows:

17           [Cases] establishing First Amendment protection for defendants in
             defamation actions surely demonstrate the Court's recognition of the
18           Amendment's vital guarantee of free and uninhibited discussion of
             public issues.  But there is also another side to the equation; we have
19           regularly acknowledged the "important social values which underlie the
             law of defamation," and recognized that "[s]ociety has a pervasive and
20           strong interest in preventing and redressing attacks upon reputation."

21   <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 22 (1990).  A defamation allegation involving a

22   written work of authorship necessarily involves consideration of state defamation law

23   weighed against the protections of the First Amendment.

24    A defamation plaintiff must prove four elements to make out a claim for defamation:

25   (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages.  <u>Mark v. Seattle</u>

26   <u>Times</u>, 96 Wn.2d 473, 486 (1981).  When a defendant in a defamation action moves for

ORDER   9–

1    summary judgment, the plaintiff has the burden of establishing a prima facie case on all four

2    elements. LaMon v. Butler, 112 Wn.2d 193, 197 (1989). The prima facie case must consist

3    of specific, material facts, rather than conclusory statements, that would allow a jury to find

4    that each element of defamation exists. Id. (citing Herron v. Tribune Pub'g Co., 108 Wn.2d

5    162, 170 (1987)). Summary judgment plays a "particularly important role" in defamation

6    cases:

7              Serious problems regarding the exercise of free speech and free press
               guaranteed by the First Amendment are raised if unwarranted lawsuits
8              are allowed to proceed to trial. The chilling effect of the pendency of
               such litigation can itself be sufficient to curtail the exercise of these
9              freedoms.

10   Mark, 96 Wn.2d at 485 (internal quotations omitted). Defendants urge that Plaintiff cannot

11   present a prima facie case for defamation and ask the Court to grant summary judgment in

12   their favor.

13          **1.      Truth and Privilege.**[3]

14          It is for the Court to determine whether a statement is capable of defamatory meaning.

15   Hoppe v. Hearst Corp., 53 Wn.App. 668, 672 (1989). "Defamatory meaning may not be

16   imputed to true statements." Lee v. The Columbian, Inc., 64 Wn.App. 534, 538 (1991). Put

17   differently, the truth is an absolute defense to a claim of defamation. Ward v. Painters'

18   Local Union No. 300, 41 Wn.2d 859, 865 (1953).

19             [A] defamation defendant need not prove the literal truth of every
               claimed defamatory statement. A defendant need only show that the
20             statement is substantially true or that the gist of the story, the portion
               that carries the "sting," is true.

21

22   _____

23        [3] Plaintiff takes great offense at the allegation that Paterson bodily copied Kildall's code:
     the "gravest of Evans' defamatory statements about Mr. Paterson was that Paterson somehow
24   took Kildall's software code and copied it bodily." See Response, docket no. 20, at 11.
     However, Plaintiff fails to identify where Evans makes this allegation, see id. at 11-14, and the
     Court is unable to locate such an allegation. Evans recounts various allegations that Paterson
25   "appropriat[ed] the 'look and feel'" of CP/M, and "cop[ied] most of the top part of Kildall's
     operating system," "took almost unaltered Kildall's Int-21 mechanism . . ." and "copied Kildall's
26   first 36 Int-21 functions into QDOS." However, the Court finds no allegation that Paterson
     "cop[ied] verbatim vast swaths of Kildall's code," as Plaintiff maintains.

ORDER   10–

1    <u>Camer v. Seattle Post-Intelligencer</u>, 45 Wn.App. 29, 38 (1986) (affirming grant of summary

2    judgment in favor of defendant where news story referred to plaintiffs as "nuisance suers").

3    Similarly, whether a statement constitutes an actionable statement of defamatory fact or a

4    statement of non-actionable opinion is an issue of law for the Court.  <u>See</u> <u>id.</u> ("[E]xpressions

5    of opinion are protected under the First Amendment."); <u>but</u> <u>cf.</u> <u>Levinsky's, Inc. v. Wal-Mart</u>

6    <u>Stores, Inc.</u>, 127 F.3d 122, 127 (1st Cir. 1997) ("[a] statement couched as an opinion that

7    presents or implies the existence of facts which are capable of being proven true or false can

8    be actionable.") (<u>citing</u> <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 18-19 (1990)).  Before

9    the truth or falsity of an allegedly defamatory statement can be assessed, the plaintiff must

10   prove that the words constituted a statement of fact, not an opinion.  <u>Robel v. Roundup</u>

11   <u>Corp.</u>, 148 Wn.2d 35, 55 (2002).

12          Because "expressions of opinion are protected under the First Amendment," they "are

13   not actionable."  <u>Camer</u>, 45 Wn.App. at 39 (<u>citing</u> <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S.

14   323, 339 (1974) ("[u]nder the First Amendment there is no such thing as a false idea")).  As

15   a threshold determination, the Court must determine whether the allegedly defamatory words

16   were intended as a statement of fact or an expression of opinion.  <u>Id.</u> ("The determination of

17   whether a communication is one of fact or opinion is a question of law for the court.").

18          <u>Camer</u> considered allegations against the Seattle Post-Intelligencer, which had

19   referred to plaintiffs as "nuisance suers."  In affirming the trial court's grant of summary

20   judgment, the Court noted:

21              In considering the article as a whole, it is evident that the tone is one of
                opinion. Virtually every statement cited as defamatory by Camer and
22              Coughlin is an opinion of one of the quoted attorneys that the lawsuits
                are frivolous and a nuisance.  One cannot determine the truth or falsity
23              of statements such as "[t]he cases have become something of a joke" or
                "[w]hat these people do is hammer us with absolute nonsense you have
24              to respond to".  Nor do the statements that the suits are "frivolous" and
                constitute a "nuisance" imply the allegation of undisclosed defamatory
25              facts as their basis.

26

1   <u>Camer</u>, 45 Wn.App. at 39.  In considering whether statements should be taken literally as

2   statements of fact, or as opinion, the Court must consider the "totality of the circumstances"

3   surrounding those statements.  See <u>Robel</u>, 148 Wn.2d at 55-56 (citing <u>Dunlap v. Wayne</u>, 105

4   Wn.2d 529, 539 (1986)).  The Court should consider, at a minimum, the medium and

5   context, the audience, and whether the statement implies "undisclosed facts."  <u>Id.</u>[4]

6   Defendants contend the "sting" of the Kildall chapter is true, and that the individual

7   statements are "indisputably true" or constitute non-actionable, privileged opinion.

8        Paterson's first allegation is that "Defendant Evans asserted that Mr. Kildall was the

9   'inventor' of DOS," which Paterson claims is false.  See Response, docket no. 20, at 4.  The

10  Court has been unable to find such an assertion in the Kildall chapter.  Accordingly, the

11  Court considers the allegedly false statements cited in the Complaint, and cited in the Kildall

12  chapter.

13      **a.      Statement No. 1.**

14          Paterson did it by taking a ride on Kildall's system with a program he
            officially called "Seattle DOS," but which he also called QDOS, for
15          Quick 'n' Dirty Operating System.  Kildall writes: "Paterson's Seattle
            DOS was yet another one of the rip-offs of the CP/M design.  The CP/M
16          machine code was taken apart, using CP/M's own DDT [its debugger],
            to determine the internal workings of CP/M in order to make a clone of
17          CP/M operation."  Paterson has denied using CP/M source code but
            admits making the two systems similar to help translate program into
18          QDOS.  *"Because of the completely different file-storage format, none
            of the internal workings has any corresponding relation to anything*
19          *within CP/M," Paterson says.*[5]

20  _____

21      [4] The D.C. Circuit has considered another formulation in evaluating of the "totality of the
    circumstances" to determine whether a statement is fact or opinion: (1) "the specific language
22  used"; (2) "whether the statement is verifiable"; (3) "the general context of the statement"; and
    (4) "the broader context in which the statement appeared."  Ollman v. Evans, 750 F.2d 970, 979
23  (D.C. Cir. 1984) (en banc) (affirming grant of summary judgment that statements as to the
    "appointment of a Marxist" at University of Maryland, with an avowed "desire to use the
24  classroom as an instrument for preparing what he calls 'the revolution'" were nonactionable
    opinion); see also Milkovich v. Lorain Journal Co. 497 U.S. 1, 8-9 (1990) (holding that the
25  implied assertion that high school coach perjured himself in judicial proceeding was sufficiently
    factual to be susceptible of being proved true or false).

26      [5] The alleged defamatory statements in the Kildall chapter are analyzed and numbered
    according to the allegations in the Complaint, docket no. 1.  Included in italics are additional

ORDER   12–

Compl., docket no. 1, ¶ 1.4.a; <u>see</u> Das Decl., Ex. B.  Defendants urge that the truth of the statements is an absolute defense to Paterson's claim of defamation, based on Paterson's own statements.  Defendants also contend that words and phrases like "rip-off" and "taking a ride on" have been rejected as defamatory due to their imprecise meaning, and are therefore incapable of defamatory meaning.

A statement must be provably false before there can be liability for defamation.[6] <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 19-20 (1990); <u>see</u> <u>also</u> <u>Phantom Touring, Inc.</u> <u>v. Affiliated Publications</u>, 953 F.2d 724, 728 (1st Cir. 1992) ("a rip-off, a fraud, a scandal, a snake-oil job was mere hyperbole and, thus, protected opinion"); <u>Spelson v. CBS, Inc.</u>, 581 F. Supp. 1195 (N.D. Ill. 1984) (<u>cited with approval by</u> <u>Camer</u>, 45 Wn.App. at 40-41) (expressions such as "unethical," "cancer con-artists," "cancer quacks," and "fraud" were constitutionally protected statements of opinion); <u>see</u> <u>also</u> <u>Dunlap</u>, 105 Wn.2d at 539-41 (characterization of request for $10,000 "finder's fee" as a "solicitation of kick-backs" was non-actionable opinion).

<u>Phantom Touring</u> considered an article which noted that the plaintiff's musical comedy production was not the same as the widely acclaimed Broadway show of the same name, and termed it "a rip-off, a fraud, a scandal, a snake-oil job."  953 F.2d at 728.

> Not only is this commentary figurative and hyperbolic, but we also can imagine no objective evidence to disprove it.  Whether appellant's "Phantom" is "fake" or "phony" is similarly unprovable, since those adjectives admit of numerous interpretations.

<u>Id.</u>; <u>see also</u> <u>McCabe v. Rattiner</u>, 814 F.2d 839, 842 (1st Cir. 1987) (holding that discussion of interactions with timeshare salespeople, together with conclusion that it was a "scam," was opinion protected by the First Amendment).  "The lack of precision [in the meaning of

---

relevant portions of the text, which are necessary for context.

[6] A person who republishes a defamatory statement may still be liable for defamation, even if the author is careful to ascribe the statements to the original speaker.  <u>Auvil v. CBS 60 Minutes</u>, 800 F. Supp. 928, 931 (E.D. Wash. 1992).

1  the word 'scam'] makes the assertion 'X is a scam' incapable of being proven true or false."

2  McCabe, 814 F.2d at 842.

3       Based on a discussion of disclosed facts in the Kildall chapter, including the writings

4  of Gary Kildall, Evans concluded that Paterson "ripped-off" CP/M.  Evans concluded that

5  Paterson created DOS "by taking a ride on Kildall's system," and that "Seattle DOS was yet

6  another one of the rip-offs of the CP/M design."[7]  However, every negative statement about a

7  person is not defamation.[8]  The Court finds that Evans' statements that Paterson "ripped-off"

8  CP/M, or "[took] a ride on" CP/M, are mere opinion based on the facts disclosed in the

9  Kildall chapter.  Just like rip-off, fraud, scandal, and snake-oil job in Phantom Touring, and

10 scam in McCabe, the allegedly defamatory words in this statement are imprecise hyperbole,

11 incapable of defamatory meaning.  Evans fully discloses the basis for his statements in the

12 Kildall chapter, and Paterson's dislike for Evans' conclusions does not make them

13 defamatory.

14      The second part of the statement quotes actual statements from Kildall and Paterson

15 on their dispute over whether Paterson actually misappropriated CP/M's code:

16          Kildall writes: " . . . The CP/M machine code was taken apart, using
            CP/M's own DDT [its debugger], to determine the internal workings of
17          CP/M in order to make a clone of CP/M operation."  Paterson has
            denied using CP/M source code but admits making the two systems
18          similar to help translate program into QDOS.  *"Because of the
            completely different file-storage format, none of the internal workings*
19          *has any corresponding relation to anything within CP/M," Paterson*
            *says.*

20

21

22 ─────────────────────

23      [7] One definition of "rip-off" proffered by Defendants is "[s]omething, as a story or film,
    that is clearly imitative or based on something else."  See WEBSTER'S II NEW COLLEGE
24 DICTIONARY 956 (1999).  Paterson's own statements concede that 86-DOS was imitative of, or
    based on, Kildall's CP/M.  See, e.g., Das Decl., docket no. 14, Ex. L (David Hunter, Tim
25 Paterson: The Roots of DOS, Softalk for the IBM Computer, March 1983) ("Step one was to
    write down what CP/M-80 did.").

26      [8] "Snitch," "squealer," and "liar," may constitute "abusive opinion," which is nonetheless
    not actionable as defamation.  Robel, 148 Wn.2d at 56.

ORDER  14–

Das Decl., Ex. B.[9]  Defendants argue this section is non-actionable opinion protected by the First Amendment, even if factually incorrect, because it presents both Kildall's accusation and Paterson's denial.  Indeed, Paterson has repeatedly denied any access to CP/M code, in any form, during his creation of DOS.  See Paterson Decl., docket no. 20-4, ¶¶ 14-16 ("I never used a debugger . . . .  I never saw CP/M source code.  I never saw CP/M binary code.").

Evans included Paterson's denial, as part of the chapter, immediately following Kildall's accusation.

> [W]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.

Partington v. Bugliosi, 56 F.3d 1147, 1156-57 (9th Cir. 1995).  Evans' discussion of the use of CP/M code devotes near equal time to Paterson's denials and Kildall's allegations.

> A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is.

Dunlap, 105 Wn.2d at 540.

Evans' reproduction of Kildall's statements in the course of presenting both sides of the argument is thus protected by the First Amendment.  The inclusion of cautionary language (i.e. "Kildall writes . . ." and "Paterson has denied . . .") weakens any inference that the author knows "undisclosed facts," and further discounts the statements as opinion. Ollman, 750 F.2d at 982-83.  Evans' reproduction of both sides of the argument presents Kildall's perspective and Paterson's denials as competing allegations, and is not actionable as defamation because it is protected by the First Amendment.

---

[9] The italicized portion is included for context.

**b.**      **Statement No. 2.**

> John Wharton, the former Intel engineer and computer specialist who became a friend of Kildall's neatly sums up the ethics of that: "I can empathize somewhat with the bind in which SCP found itself: unable to sell its 8086 hardware for lack of software and unable to buy the software it wanted.  But for Mr. Paterson to cite the unavailability of CP/M-86 as justification for appropriating the 'look and feel' of a competing operating system and its utilities seems to me analogous to telling a judge, 'I needed the car, Your Honor, and the plaintiff wouldn't sell me his, so I was forced to take it.'"

Compl., docket no. 1, ¶ 1.4.b.  This second allegedly defamatory statement was written by John Wharton in 1994, in response to Paterson's criticism of his Tribute to Gary Kildall.  See Das Decl., docket no. 14, Ex. J (Tim Paterson, The Origins of DOS: DOS Creator Gives His View of Relationship Between CP/M, MS-DOS, Microprocessor Report, Oct. 3, 1994, Letter to the Editor).

Plaintiff urges that Wharton's analogy "implies not only that an entire car was taken, but that it was stolen."  See Response, docket no. 20, at 12.  However, defamation must follow a statement that expresses or implies provable facts.  See Schmalenberg v. Tacoma News, Inc., 87 Wn.App. 579, 590-91 (1997).  In this instance, what Paterson claims as "translation compatibility" (a primary design requirement for DOS), see Paterson Decl., docket no. 20-4, ¶ 6, Wharton claims is the "look and feel" of CP/M.

Plaintiff's attempts to explain away the similarities between DOS and CP/M as a necessary component weakens his defamation argument:

> Translation compatibility, a goal that Mr. Paterson admits to having, was required in order to allow programmers to translate their 8 bit programs into 16 bit programs that would operate on the operating system.  *Mr. Paterson could just as easily labeled the actions as something else, but he would have run the risk that programmers, unwilling to start from scratch with another set of labels, would not adapt their programs to the operating system.*

Response, docket no. 20, at 12:11-15 (emphasis added).  Evans merely repeats Wharton's opinion of Paterson's choice to "label[] the actions" just like CP/M for the sake of "translation compatibility."  Wharton urged this was "appropriating the 'look and feel'" of

ORDER   16–

1  CP/M; Paterson says it was necessary for the success of his DOS, for "translation

2  compatibility."

3        Wharton believed the appropriation was akin to taking a car without permission.

4  More important than the characterization, however, is Evans inclusion of both sides of the

5  debate.  Indeed, Evans' quotation of Wharton's analogy would be meaningless without

6  supporting facts.  Wharton's analogy might have been phrased differently, but Evans cannot

7  be expected to recast historical statements in public debate for purposes of the Kildall

8  chapter.  Evans' reprinting of the statement that Paterson appropriated the "look and feel" of

9  CP/M, and the "I needed the car" analogy is not defamatory.  The statements are not

10  provably false, they are not defamatory, and writing on the debate is protected by the First

11  Amendment.

12        **c.    Statement Nos. 3, 4.**

13              ". . . Paterson's adaptation of Kildall's system . . ."

14  Compl., docket no. 1, ¶ 1.4.c.

15              ". . . Paterson's version of Kildall's program . . ."

16  Compl., docket no. 1, ¶ 1.4.d.

17        Defendants argue that these statements are non-actionable opinion, based in part on

18  Microsoft CEO Steve Ballmer's one-time statement that "Tim Patterson's [sic] operating

19  system . . . was, well, adapted from Gary Kildall's CP/M."  See Das Decl., docket no. 14,

20  Ex. T (Triumph of the Nerds: The Transcripts, Part II, available at http://www.pbs.org/nerds/

21  part2.html, at HGB000699).  Much like Kildall's statements that Paterson's DOS was a "rip-

22  off" of Kildall's system, these statements merely convey Evans' sarcastic opinion that

23  Paterson's DOS was merely a "version" or "adaptation" of CP/M.  The statements

24  themselves are incapable of being proved false: they are an expression of Evans' opinion that

25  DOS was so closely akin to CP/M that it could be called a "version" or "adaptation" of the

26  latter.  Biting commentary of this type (i.e., commentary on disclosed facts) is the hallmark

of First Amendment protection.  The statements convey opinion based on discussed and

disclosed facts, and are incapable of defamatory meaning.

> **d.      Statement Nos. 5, 6.**

> What Paterson essentially had done was rewrite the bottom part of the software – improving the way files were stored and adapting the program to a 16-bit machine – while copying most of the top part of Kildall's operating system (the Int-21 commands that allowed the operating system to interact with the application program).  Even if QDOS and CP/M were 80 percent different, as Paterson has said, he took almost unaltered Kildall's Int-21 mechanism – the heart of his innovation.  An independent examination of the two systems shows some blatant copies, some slight alterations.  *For instance, CP/M began each new line with:*

> > *A:*

> *The DOS prompt was:*

> > *A>*

> Paterson copied Kildall's first 36 Int-21 functions into QDOS.  *He did rename Kildall's "Read Sequential" function "Sequential Read"; "write sequential" became "sequential write"; "Read Random" was called "Random Read."  And so on.*

> *In addition, CP/M's ED program was almost the same as PC-DOS's EDLIN editor program.*[10]

Compl., docket no. 1, ¶ 1.4.e-f; see also Das Decl., Ex. B.  Paterson argues the Evans'

contention that Paterson "took almost unaltered Kildall's Int-21" is false and defamatory,

because "Mr. Kildall did not have an Int-21 mechanism in his CP/M software."  See

Response, docket no. 20, at 10; see also Hollaar Decl., docket no. 20-3, ¶¶ 11-12.

Through the Hollaar Declaration, the Plaintiff provides substantial detail as to why

CP/M does not actually have an Int-21 mechanism.  Mr. Hollaar further asserts that "[t]he

calling of the operating system when a function is required by the application program is

---

[10] Included in italics with the alleged defamatory statement are additional relevant portions of the text, which the Court believes are necessary for context.  In this case, the additional text includes examples from the "independent examination" described in the text, and the substance of the allegation that Paterson copied Kildall's first 36 Int-21 functions into QDOS.

ORDER   18–

1   certainly not original to Kildall." <u>See</u> Hollaar Decl., docket no. 20-3, ¶ 14.  The substance of

2   Plaintiff's challenge, however, is merely that the name given to the function list he copied

3   was incorrect (i.e., that Paterson "took almost unaltered Kildall's [function subroutine] – the

4   heart of his innovation," as opposed to Kildall's Int-21 mechanism.).  Evans does attribute

5   the "Interrupt 21" functions of DOS to Mr. Kildall, although Kildall had the same functions

6   located within a different mechanism.  <u>See</u> Tomkins Decl., docket no. 21, Ex. E.  The

7   incorrect detail regarding the "Int-21" label, however, is immaterial.  Kildall's function calls

8   were copied, almost verbatim, by Paterson.  <u>See</u> <u>also</u> Tomkins Decl., docket no. 20-2, Ex. E

9   (Kildall Memoir, Appendix B: A Comparison of CP/M and MS-DOS (unpublished)).

10          The truth of the statement is an absolute defense to a claim of defamation.  <u>Ward</u>, 41

11  Wn.2d at 865.  The literal truth of every detail need not be proved: it is sufficient if the

12  statement is substantially true, or the gist of the story, its "sting," is true.  <u>Camer</u>, 45

13  Wn.App. at 38.  On the undisputed facts before the Court, Paterson used CP/M's function

14  calls, with the similar labels, to ensure translation compatibility and for programmer

15  acceptance.  <u>See</u> Response, docket no. 20, at 12:11-15; Paterson Decl., docket no. 20-4, ¶¶ 5,

16  6.  Plaintiff's contention that CP/M did not have "Interrupt 21" mechanism at a singular

17  detail of the allegation, rather than its substantial truth.  The functions in Paterson's DOS

18  were copied from CP/M, for translation compatibility.  Even if Kildall's CP/M did not have

19  an "Int-21" mechanism, DOS function calls, "the [] commands that allowed the operating

20  system to interact with the application program," were copied from CP/M.  <u>See</u> Hollaar

21  Decl., docket no. 20-3, ¶ 11.  The sting of the Kildall chapter with regard to CP/M's function

22  calls is substantially true, and Evans' statements are not actionable as defamation.

23          **e.      Statement No. 7.**

24                  Paterson's file system, Rolander acknowledges, was better for the larger
                    disks, but he adds that mistakes were made in cloning Kildall's work.
25
    Complaint ¶ 1.4.g.  Paterson challenges this statement as defamatory.  <u>See</u> <u>id.</u>  However,
26
    Paterson has explained, for example, that MS-DOS did not implement CP/M function 12

ORDER   19–

(0Ch) to get the system version number, likely as a result of his reliance on different versions of the CP/M Interface Guide.  See Das Decl., docket no. 14, Ex. A (Paterson Dep. at 68:15-69:4).  Paterson does not challenge, in Response, Evans' statement that "mistakes were made."  Accordingly, the Court finds no false statement or defamatory meaning.

Paterson also takes issue with Evans' characterization of his work as "cloning Kildall's work," claiming defamation.  However, as with Evans' allegations that DOS was "Paterson's version" (or "Paterson's adaptation") of CP/M, the statement that Paterson "clon[ed]" CP/M constitutes non-actionable opinion.  Plaintiff does not allege that Evans' "cloning" allegation is provably false, and his expert, Lee Hollaar, opines that "[a]s with many terms in computer technology, there is no precise definition of 'clone.'"  See Hollaar Decl., docket no. 20-3, at ¶ 27.  Given the imprecise nature of the word "clone," and the admitted substantial influence of CP/M on DOS, the Court finds no defamatory meaning in the allegation that Paterson "clon[ed] Kildall's system."[11]

─────────────────────

[11] As an additional basis for his defamation claim, Plaintiff asserts that the Kildall chapter falsely asserts that Kildall could have sued Microsoft: "[t]he obvious question is why Kildall did not sue Microsoft as he was free to do so. * * * The decision not to sue was a disastrous error." See Das Decl., docket no. 14, Ex. B, at 413.  Plaintiff alleges that Kildall was not the "nice" person described in the Kildall chapter, and that DRI could not have won its lawsuit against Microsoft, as alleged by persons quoted in the chapter.

> "Yeah," says [DRI's Gerry] Davis now, "what we should have done in retrospect was gone in and sued Microsoft very early on, even with the uncertainty in the law, because it would have stopped the development of a competitor.  And if we had stopped them to begin with, they would never have gotten the foothold they have."

See id., Ex. B, at 414.  Plaintiff alleges the implication that Kildall could have sued is both false and defamatory, because Kildall had "voluntarily waived the right to sue in his agreement with IBM.  See Exhibit D, Contract with IBM."  Unfortunately, Plaintiff fails to cite the applicable portion of the agreement.  However, section (o) of the Agreement between DRI and IBM reads as follows:

> VENDOR hereby expressly releases and forever discharges IBM of and from all claims . . . in any way relating to . . . IBM Personal Computer DOS . . . .

See Tomkins Decl., docket no. 21, Ex. D (IBM Contract) at 16.  The release of IBM had no effect on DRI's ability to bring a claim against Microsoft – except with regard to its

ORDER  20–

1        **2.      Fault.**

2        The third element a defamation plaintiff must prove is fault.  Mark, 96 Wn.2d 473,

3    486 (1981).  The necessary degree of fault depends on whether a plaintiff is a private

4    individual or a public figure.  Caruso v. Local Union No. 690 of Intern. Broth. of Teamsters,

5    100 Wn.2d 343, 352 (1983).  If the plaintiff is a private individual, a negligence standard of

6    fault applies.  Id. (quoting Taskett v. KING Broadcasting Co., 86 Wn.2d 439, 445 (1976)).

7    If the plaintiff is a public figure, the plaintiff must prove "actual malice" in order to recover.

8    Caruso, 100 Wn.2d at 352 (quoting Gertz, 418 U.S. at 342).

9        Actual malice requires proof by "clear and convincing evidence" of "knowledge of the

10   falsity or reckless disregard of the truth or falsity of the statement."  Id.; Flowers v. Carville,

11   310 F.3d 1118, 1130 (9th Cir. 2002).  The First Amendment defines the boundaries of fault

12   in an action for defamation involving a public figure.  E.g., Masson v. New Yorker

13   Magazine, Inc., 501 U.S. 496, 499 (1991).

14       **a.      Mr. Paterson as a Limited-Purpose Public Figure.**

15       The parties agree that it is for the Court to determine whether or not Mr. Paterson is a

16   public figure.  See Response, docket no. 20, at 6 ("[w]hether or not a party is a public figure

17   is a question of law which must be decided by the court") (citing Wolston v. Reader's Digest

18   Ass'n, Inc., 578 F.2d 427, 429 (D.C. Cir. 1978), rev'd on other grounds, 443 U.S. 157

19   (1979).  The Court's determination regarding whether an individual is a public figure may

20   rest on either of two alternative bases.  First,

21   _____

22   development of IBM PC-DOS.  The agreement left open the possibility of suing Microsoft for
     MS-DOS.

23

24                . . . provided, however, that such release and immunity shall not extend to
                  the offering of similar DOS operating systems to others by such suppliers,
                  developers and maintainers.

25

26   Id. at 18 (emphasis in original).  This is consistent with Evans' averment in the Kildall chapter
     that Kildall had agreed not to sue IBM, "but did not agree to an undertaking to refrain from
     suing Microsoft."  See Das Decl., docket no. 14, Ex. B, at 413.

ORDER   21–

1
2

> [i]n some instances an individual may achieve such pervasive fame or
> notoriety that he becomes a public figure for all purposes and in all
> contexts.

3   Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974).  The courts have generally referred to

4   such persons as "general purpose" public figures.  E.g., Harris v. Tomczak, 94 F.R.D. 687,

5   700 (E.D. Cal. 1982).  A "general public figure is a well-known 'celebrity,' his name a

6   'household word.'" Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1294 (D.C.

7   Cir. 1980).  There is no allegation that Mr. Paterson is a "general purpose" public figure.

8      A "general purpose" public figure is much less common than a "limited purpose"

9   public figure.  The Supreme Court described a limited purpose public figure in Gertz:

10
11

> More commonly, an individual voluntarily injects himself or is drawn
> into a particular public controversy and thereby becomes a public figure
> for a limited range of issues. In either case such persons assume special
> prominence in the resolution of public questions.

12
13   418 U.S. at 351; accord Dworkin v. Hustler Magazine Inc., 867 F.2d 1188, 1197 (9th Cir.

14   1989).  "[A] public controversy is one that touches upon serious issues relating to community

15   values, *historical events*, governmental or political activity, arts, education, or public safety.

16   Wells v. Liddy, 186 F.3d 505, 540 (4th Cir. 1999) (emphasis added).  Defendants allege that

17   Mr. Paterson is a "limited purpose" public figure for the limited range of issues surrounding

18   the long-standing controversy regarding the paternity of DOS.  Paterson counters that his

19   actions are insufficient to establish involvement in a "public controversy," and contends the

20   dispute regarding CP/M and DOS was only between Kildall and Gates.  See Response,

21   docket no. 20, at 7-8.

22      An individual need not be known outside of his or her particular industry to be a

23   limited purpose public figure.  For example, in Waldbaum v. Fairchild Publications, Inc.,

24   627 F.2d 1287 (D.C. Cir. 1980), the Court considered a supermarket executive whose

25   advocacy for certain policies was known in the industry and reported in trade publications.

26   The Court noted that:

1
2

> Those who attempt to affect the result of a particular controversy have
> assumed the risk that the press, in covering the controversy, will
> examine the major participants with a critical eye.

3    Id. at 1298.  The Court found that the supermarket executive was a limited purpose public

4    figure with respect to public controversy surrounding the viability of precedent-breaking

5    policies, and the allegation that his leadership resulted in losses to the supermarket

6    cooperative and his ultimate dismissal.  Id. at 1299 ("public controversies existed over the

7    viability of cooperatives as a form of commercial enterprise and over the wisdom of various

8    policies that Greenbelt in particular was pioneering.").  The Court's analysis of whether a

9    public controversy actually existed is instructive:

10
11
12
13
14
15

> To determine whether a controversy indeed existed and, if so, to define
> its contours, the judge must examine whether persons actually were
> discussing some specific question.  A general concern or interest will
> not suffice.  The court can see if the press was covering the debate,
> reporting what people were saying and uncovering facts and theories to
> help the public formulate some judgment.  It should ask whether a
> reasonable person would have expected persons beyond the immediate
> participants in the dispute to feel the impact of its resolution.  *If the
> issue was being debated publicly and if it had foreseeable and
> substantial ramifications for nonparticipants, it was a public
> controversy.*

16    Id. at 1297.  The Court in Daniel Goldreyer, Ltd. v. Dow Jones & Co., Inc., 259 A.D.2d 353

17    (N.Y.A.D. 1999) reached a similar result with regard to an art restorer, "controversial and

18    well-known in the profession, but not outside of it."  The Court found the plaintiff was an

19    "involuntary limited purpose public figure" based on the public controversy surrounding "his

20    use of certain questionable techniques in the restoration of a valuable painting for a Dutch

21    museum."  Id. at 353.  The Court concluded that the plaintiff must prove "that a reasonable

22    jury might find that actual malice ha[s] been shown with convincing clarity."  Id. at 353-54.

23        Paterson urges the Court to conclude that his public involvement in the controversy

24    amounts to "a couple of articles in trade journals that refer to Mr. Paterson's role in the

25    development of DOS," and "one letter to the editor where Mr. Paterson takes issue with

26    Kildall's characterization of his work as derivative."  See Response, docket no. 20, at 8.

ORDER   23–

However, the scope of the public controversy was extensive, as was Paterson's involvement. Infoworld's comment that IBM's operating system would "be similar to CP/M in many respects" was perhaps the first comparison of similarities between the operating systems. See Das Decl., docket no. 14, Ex. S.  Kildall's phone call to Paterson, accusing him of "ripping off" CP/M, see id., Ex. G at 184, followed popular, public recognition of similarities between the two operating systems.  DOS was "a CP/M-look-alike operating system."  Id., Ex. U (Kevin Strehlo, Microsoft Expands, Weighs Dependence Against Autonomy, PC Week, Sept. 1984).  Paterson also provided commentary on his reliance on CP/M during the creation of DOS.  Id., Ex. L (David Hunter, Tim Paterson: The Roots of Dos, Softalk for the IBM Computer, March 1983 ("Step one was to write down what CP/M-80 did.")).

Public controversy grew with articles and statements following Kildall's death in 1994.  John Wharton wrote a tribute to Kildall in Microprocessor Report, to which Mr. Paterson responded with a lengthy, substantive letter to the editor.  See Das Decl., docket no. 14, Ex. J (Tim Paterson, The Origins of DOS: DOS Creator Gives His View of Relationship Between CP/M, MS-DOS, Microprocessor Report, Oct. 3, 1994, Letter to the Editor).  Paterson disputed Wharton's "characterization" of DOS as "an unauthorized 'quick and dirty' knockoff of CP/M from Seattle Computer Products."  Id.  Although not directly disputing that DOS was a knockoff of CP/M, Paterson explained that CP/M-86 was unavailable, and that Seattle Computer Products was in desperate need of software for Intel's 8086.  Id.  Paterson explained that the interface used by applications (to make it as easy as possible for developers) would necessarily be the same:

> In other words, the interface used by applications to request operating system services would be exactly the same as CP/M's after applying the translation rules.

Id.  Paterson conceded that he copied application-visible elements from CP/M, and that he relied upon the CP/M Interface Guide in writing DOS:

ORDER   24–

So 86-DOS generally had all the same application-visible elements as CP/M–the function codes, the entry point address, part of the File Control Block layout, etc.  I used the 1976 CP/M Interface Guide for my description of the requirements.  I also provided some similar commands from the console such as DIR, RENAME, ERASE--although any system would have such functions, regardless of name chosen.

Id.  Paterson set forth his version of events relating to the creation of DOS in the letter, and then in closing directed readers to books for which Paterson had provided interviews, Gates and Hard Drive.  See Das Decl., docket no. 14, Ex. G, H (James Wallace & Jim Erickson, Hard Drive: Bill Gates and the Making of the Microsoft Empire (John Wiley & Sons, Inc. 1992)) (Stephen Manes & Paul Andrews, Gates: How Microsoft's Mogul Reinvented an Industry-and Made Himself the Richest Man in America (Doubleday 1993)).

In Hard Drive, Paterson told of a telephone confrontation with Kildall, in which he accused Paterson of "ripping off" CP/M:

"At the time," said Paterson, "I told him I didn't copy anything.  I just took his printed documentation and did something that did the same thing.  That's not by any stretch violating any kind of intellectual property laws.  Making the recipe in the book does not violate the copyright on the recipe.  I'd be happy to debate this in front of anybody, any judge."

See Das Decl., docket no. 14, Ex. G at 184.

In other publications, Paterson defended his authorship of DOS from Kildall's persistent allegations of copying, including an article written for the "Encyclopedia of Computers and Computer History."  See id., Ex. EE.  In writing this article, Mr. Paterson admits his goal was to address the continuing controversy whether QDOS was a "clone" or "rip off" of CP/M, "thinking if I explain it, you know, fully and in detail people will understand."  Id., Ex. A (Paterson Dep. 224:20-225:7).

Paterson has written articles for Byte Magazine, and authored other articles on the origins of DOS.  He has made himself available for interview since the early 1980s, and maintains a collection of articles by him, and about him, on his web site.  See Johnson Decl., docket no. 23-2, Ex. A (Paterson Dep. at 73-74).  Paterson actively sought to influence

ORDER   25–

1  public perception of himself and his authorship of DOS.  Having voluntarily injected himself

2  into the public controversy surrounding the paternity of DOS, Tim Paterson is a limited

3  purpose public figure.[12]

4       **b.    Actual Malice.**

5       A public figure defamation plaintiff must prove, with evidence of "convincing

6  clarity," that the defendant published false and defamatory statements with *actual malice*.

7  E.g., Curtis Publ'g Co. v. Butts, 388 U.S. 130, 155 (1967); see also Flowers v. Carville, 310

8  F.3d 1118, 1130 (9th Cir. 2002) (Actual malice "must be satisfied by clear and convincing

9  evidence . . .").  Paterson concedes that a limited purpose public figure must prove actual

10 malice at trial.  See Response, docket no. 20, at 22.[13]

11      Actual malice is a subjective standard, turning on the defendant's state of mind.

12 Flowers, 310 F.3d at 1131.  Actual malice means the publication was made "with knowledge

13 it was false or with reckless disregard of whether it was false or not."  New York Times Co.

14 v. Sullivan, 376 U.S. 254, 279-80 (1964); see also Hoppe, 53 Wn.App. at 676 ("To prove

15 actual malice, a plaintiff usually must establish that the declarant knew the expression was

16 false, acted with a high degree of awareness of its probable falsity, or in fact entertained

17

---

18      [12] Mr. Paterson cites only one case in connection with the issue of a limited purpose
public figure, and urges the Court to apply the four-part limited purpose public figure test set

19 forth in Lerman v. Flynt Distributing Co., Inc., 745 F.2d 123, 136-37 (2d Cir. 1984).  Under

20 Lerman, a defendant must show a plaintiff has (1) successfully invited public attention to his
views in an effort to influence others prior to the incident that is the subject of litigation; (2)
voluntarily injected himself into a public controversy related to the subject of the litigation; (3)

21 assumed a position of prominence in the public controversy; and (4) maintained regular and
continuing access to the media.  Mr. Paterson's role in the controversy surrounding DOS meets

22 and exceeds each of the elements under Lerman.  Over a period of decades, Paterson has invited
the public to consider his viewpoint, as the "father of DOS."  He has maintained regular access

23 to the media, and has publically disputed any questioning of the relationship between DOS and
CP/M.  Mr. Paterson is a limited public figure under any formulation of the test.

24

25      [13] Plaintiff cites RCW 9.58.020 in a footnote, noting that publications falling within the
criminal statute are "deemed malicious unless justified or excused."  See Response, docket no.
20, at 22 n.3.  However, the criminal libel statute has "no relation whatever to a civil action for

26 damages."  Tolan v. Washington, 2005 WL 1378755 (W.D. Wash. 2005) (quoting Enright v.
Bringgold, 106 Wn. 233 (1919)).

ORDER   26–

1   serious doubts as to the statement's truth."); accord Harris v. City of Seattle, 315 F. Supp. 2d

2   1105, 1110 (2004).

3           Reckless disregard "is not measured by whether a reasonably prudent
            man would have published, or would have investigated before
4           publishing.  There must be sufficient evidence to permit the conclusion
            that the defendant in fact entertained serious doubts as to the truth of
5           [the] publication."

6   Harris, 315 F. Supp. 2d at 1110 (citing St. Amant v. Thompson, 390 U.S. 727, 731 (1968).

7           The plaintiff must prove actual malice by clear and convincing evidence.  Id.  Actual

8   malice can be proven only through "sufficient evidence to permit the conclusion that the

9   defendant in fact entertained serious doubts as to the truth of his publication."  St. Amant,

10  390 U.S. at 731 (1968).   At summary judgment in a public figure defamation proceeding, the

11  Court must consider whether there is evidence to support a finding of actual malice.  Suzuki

12  Motor Corp. v. Consumers Union of U.S., Inc., 330 F.3d 1110, 1134-35 (9th Cir. 2003).

13          Paterson argues that "[h]e need not prove [actual malice] to survive summary

14  judgment," citing Demopolis v. Peoples Nat. Bank of Washington, 59 Wn.App. 105, 117

15  (1990).  Plaintiff's reliance on Demopolis is misplaced.  In Demopolis, at the conclusion of

16  plaintiff's case, the trial court held actual malice was a question of fact for the jury.[14]

17  Nevertheless, the court dismissed the case, ruling that Demopolis had failed to meet his

18  burden on two elements: an unprivileged communication, and damages.  The Washington

19  Court of Appeals held dismissal of the defamation claim for failure to prove damages was

20  error.  In fact, the defendant had not even assigned error to the court's finding that actual

21  malice presented a triable issue of fact for the jury.

22          The heavy burden of clear and convincing evidence of actual malice "is imposed at

23  the summary judgment stage as well as at trial.  Herron, 108 Wn.2d at 170.  At the summary

24

25          [14] Demopolis brought his defamation claim after an attorney for People's National Bank,
    Mr. James Hermsen, allegedly stated the he was going to "nail" Demopolis for $150,000 in
26  attorney fees, because Demopolis had been "convicted of perjury."  It was undisputed that
    Demopolis has never been charged with, nor convicted of, perjury.

ORDER  27–

1    judgment stage, the plaintiff must offer evidence that "could support a reasonable jury

2    finding . . . that the plaintiff has shown actual malice by clear and convincing evidence."

3    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56 (1986).

4         Defendants urge that Paterson cannot prove actual malice because the Kildall chapter

5    merely repeated the widely held consensus that QDOS and MS-DOS were clones of CP/M.

6    Defendants note that Mr. Evans, as explained at his deposition, relied on his research and

7    believed he was merely "reporting from the industry."  See Das Decl., docket no. 14, Ex. HH

8    (Evans Dep. 154:24-25).  Evans further stated that the Kildall chapter merely "recapitulate[d]

9    and state[d] what eleven, twelve, fifteen other books [said] and there [was] no public outcry,

10   no public corrections, no website corrections, no criticism in reviews [that any of the

11   accounts were erroneous.]" See id. Ex. HH (Evans Dep. 114:4-114:21).  Paterson counters

12   that actual malice may be found where a defendant consciously avoids discovering the truth

13   as it relates to defamatory allegations, and urges that Evans consciously avoided learning the

14   truth about the relationship between DOS and CP/M.  See, e.g., Harte-Hank Communications

15   v. Connaughton, 491 U.S. 657, 667 (1989).

16        Harte-Hank considered factors which might indicate a conscious disregard for the

17   truth, including the disregard of statements supporting the plaintiff's position, concerns with

18   the veracity of statements relied upon, and the failure to interview witnesses and review

19   available information.  See id. at 691-92.  Notably, however, the mere failure to investigate is

20   not actual malice.  See Herron, 108 Wn.2d at 171 (affirming summary judgment in favor of

21   newspaper that reprinted recall petition charges without performing an independent

22   investigation).  To prove actual malice, a plaintiff usually must establish that the declarant

23   knew the expression was false, acted with a high degree of awareness of its probable falsity,

24   or in fact entertained serious doubts as to the statement's truth.  Margoles v. Hubbart, 111

25   Wash.2d 195, 202 (1988) (finding no actual malice regarding newspaper statement regarding

26

ORDER  28–

improper use of port vehicle, where the port manager admitted to a warning, after one incident, not to make unauthorized use of vehicle).

In nineteen bullet points, Paterson cites evidence in support of his allegation that "Evans . . . either knew of the falsity of the statements he made, or consciously avoided discovering the truth." Response, docket no. 20, at 24-27. Unfortunately, the information cited is largely unrelated to Paterson, or is not probative of the controversy in this case. The topics relate to, *inter alia*:

- IBM's choice of MS-DOS over CP/M;
- pricing of CP/M;
- influence of the DEC PDP-10 on CP/M;
- Gates' knowledge of the extent of the similarities between CP/M and MS-DOS;
- the reliability of Kildall's manuscript;
- Kildall's ability to sue;
- similarity of the functions of MS-DOS and CP/M;
- important differences between CP/M and DOS;
- "excuse[s]" for why the operating systems were similar;
- Kildall's contention that CP/M and 86-DOS had the same code;
- Kildall's GEM operating system;
- the contract between DRI and IBM;
- Kildall's bitterness and animosity toward Gates; and
- Evans failure to interview Tim Paterson.

Response, docket no. 20, at 24-27. In spite of the collection of facts cited by Mr. Paterson, there is little, if any, evidence which bears on the question of actual malice, or Evans' knowledge of the falsity of any statements included in the Kildall chapter.

For example, the first bullet relates to IBM's choice of MS-DOS over CP/M. Id. at 24. However, IBM's choice of MS-DOS may be relevant to the Kildall chapter, but it is

ORDER   29–

wholly unrelated to whether Paterson, in fact, "cloned" or "copied" CP/M, or with whether Evans acted with actual malice.  Similarly, the second bullet relates CP/M pricing, theorizing that Kildall was responsible for the disastrously high price of CP/M.  Id. at 24.  However, the price of CP/M may be relevant to the eventual failure of CP/M, but is in no way relevant to whether Paterson copied CP/M or was defamed by Evans' book.  The remaining bullets consider allegedly bad things Kildall may have done, the merits of other lawsuits and charges against him, and whether Kildall was an alcoholic.  Indeed, the main point of these facts seems to be that Kildall wasn't such a great person, and therefore the Evans' chapter shows a reckless disregard for the truth because he lionizes Kildall.

Evans' consideration of different facts and viewpoints, or his failure to discuss Kildall's business disputes or personal problems (which came years later), is simply irrelevant to whether Evans' chapter is inaccurate or defamatory, or whether Evans had doubts about its accuracy at the time of publishing.  Plaintiffs fail to provide *any* evidence regarding "serious doubts" about the accuracy of the Kildall chapter.  Instead, a careful review of the Lefer notes, Tomkins Decl., docket no. 20-2, Ex. C, provides a research picture tellingly close to the substance of the final chapter.

Plaintiff's final allegation, described as "most telling of all," is Evans' failure to interview Paterson.  However, the mere failure to investigate is not actual malice.  See Herron v. Tribune Pub. Co., Inc., 108 Wn.2d 162, 171 (1987) (actual malice is not proved by showing that the publisher failed to investigate the basis for his statements or that a more prudent person would have refrained from such publications); Parry v. George H. Brown & Associates, Inc., 46 Wn.App. 193, 197 (1986) (actual malice is not shown by failure to investigate); DARE America v. Rolling Stone Magazine, 101 F. Supp.2d 1270, 1284 n.3 (C.D. Cal. 2000) (defendants not required to contact subjects of the article before publication), aff'd, 270 F.3d 793 (9th Cir. 2001).  Coupled with additional evidence, however, the failure to investigate, negligence, anger or hostility toward plaintiff, and

1   reliance on sources known to be unreliable, could cumulatively be sufficient to establish a

2   clear and convincing inference of actual malice.  Herron, 108 Wn.2d at 172.  However, in

3   this case Plaintiff fails to demonstrate even a failure to investigate.  Paterson's position in the

4   public controversy was published in numerous places and has not changed in this litigation.

5       Defendant urges that consulting with Paterson would have changed nothing.  See

6   Reply, docket no. 22, at 11.  His interviews and publications set forth a defense to the

7   cloning charges, i.e., that "translation compatibility" and programmer acceptance dictated his

8   design choice to copy CP/M's function calls.  See Paterson Decl., docket no. 20-4, ¶¶ 5, 6.

9   The failure to interview Mr. Paterson is not probative of actual malice, in this case.

10      Herron considered a series of editorials which reprinted charges contained in a recall

11  petition against Pierce County Prosecutor Don Herron.  108 Wn.2d at 162.  The principal

12  issue was the question of actual malice.  Herron noted that the "clear and convincing

13  evidence" standard was imposed at the summary judgment, as well as trial, and that the

14  plaintiff must offer "evidence sufficient to permit a reasonable trier of fact to find clear and

15  convincing proof of actual malice."  Id. at 169-70.  The Court noted that

16          although negligence, a failure to investigate, anger or hostility towards
            the plaintiff, or reliance on sources known to be unreliable would each
17          alone be insufficient proof, when viewed cumulatively and in
            appropriate circumstances they may establish a clear and convincing
18          inference of actual malice.

19  Id. at 172 (citing Goldwater v. Ginzburg, 414 F.2d 324, 342 (2d Cir.1969)).  However, in

20  spite of a broad attack on the recall charges, the Supreme Court found clear and convincing

21  evidence of actual malice only where the reporter had actually been present during a hearing

22  which was the subject of one of the recall charges.  Id. at 173-74.[15]  In powerful language,

23  Herron noted the limits on a public figure defamation plaintiff:

24  _____

25      [15] The charge was that a sentencing judge had not been informed of the full extent of
    defendant's drug-manufacturing operations, resulting in a relatively short 60-day sentence.
26  Plaintiff noted the judge had been fully informed, and that the reporter had been present at the
    hearing.  There was no evidence refuting the assertion that the judge had been fully informed
    of the extent of the defendant's activities.

ORDER  31–

1
2
3

> Thus, the public figure's critics have no affirmative duty to search out the truth or to substantiate their statements, nor are they required to corroborate their sources' information. The only limitation on free expression is liability imposed for false and damaging statements made with actual knowledge of or in reckless disregard of their falsity.

4   Id. at 171 (citing Garrison v. State of La., 379 U.S. 64, 79 (1964)).

5   Relevant to the actual malice inquiry is the "sting" of the Kildall chapter. Although

6   the facts presented and discussed in the chapter could be viewed differently (i.e., in a light

7   more favorable to Paterson), the Kildall chapter – as written – is not probably false. Paterson

8   fails to cite evidence probative of actual malice. There is no evidence of a reckless disregard

9   for the truth, and there is no evidence Evans "in fact entertained serious doubts as to the truth

10  of his publication." See St. Amant, 390 U.S. at 731. There is insufficient evidence to

11  establish with "convincing clarity" or by "clear and convincing proof" that Mr. Evans acted

12  with actual malice. Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 773 (1986). As a

13  limited purpose public figure, Mr. Paterson's defamation claims require clear and convincing

14  proof of actual malice. Because Mr. Paterson has presented no such evidence, summary

15  judgment for the Defendants is appropriate on all claims.

16  **B.    False Light**

17  In addition to his claim for defamation, Paterson asserts a claim for false light

18  invasion of privacy. A false light claim arises when someone publicizes a matter that places

19  another in a false light if (a) the false light would be highly offensive to a reasonable person

20  and (b) the actor knew of or recklessly disregarded the falsity of the publication and the false

21  light in which the other would be placed. Eastwood v. Cascade Broadcasting Co., 106

22  Wn.2d 466, 470-71 (1986) (citing Restatement (Second) of Torts § 652E (1977)).

23
24
25
26

> The theoretical difference between [defamation and false light] is that a defamation action is primarily concerned with compensating the injured party for damage to reputation, while an invasion of privacy action is primarily concerned with compensating for injured feelings or mental suffering. The two torts overlap, however, when the statement complained of is both false and defamatory. In such a case the plaintiff can proceed upon either theory, or both, although he can have but one recovery for a single instance of publicity.

ORDER   32–

Id. at 470. A plaintiff need not be defamed to bring a false light action:

> It is enough that he is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position. When this is the case and the matter attributed to the plaintiff is not defamatory, the rule here stated affords a different remedy, not available in an action for defamation.

Id. (citing Restatement (Second) of Torts § 652E, cmt. b.).

However, a public figure plaintiff cannot recover on a false light claim unless he or she can prove the defendant acted with actual malice. See Hoppe, 53 Wn.App. at 677.

**1.    Actual Malice**

Defendants urge the Court to dismiss Plaintiff's false light claim because Plaintiff has failed to provide evidence of actual malice. See, e.g., Flowers, 310 F.3d at 1132 ("[J]ust like public figure defamation, [false light invasion of privacy] requires actual malice – knowing or reckless disregard of the truth."); see also Hoppe, 53 Wn.App. at 677 (citing Hustler Magazine v. Falwell, 485 U.S. 46, 52 (1988)).

> [E]ven though falsehoods have little value in and of themselves, they are nevertheless inevitable in free debate, and a rule that would impose strict liability on a publisher for false factual assertions would have an undoubted chilling effect on speech relating to public figures that does have constitutional value. Freedoms of expression require breathing space. This breathing space is provided by a constitutional rule that allows public figures to recover for libel or defamation only when they can prove both that the statement was false and that the statement was made with the requisite level of culpability.

Falwell, 485 U.S. at 52. Because Paterson is a limited purpose public figure, Evans' commentary is subject to the protections of the First Amendment. Flowers, 310 F.3d at 1132. The Court therefore dismisses Mr. Paterson's claim for false light invasion of privacy because he fails to provide any evidence that Evans acted with actual malice.

## CONCLUSION

The Court GRANTS the Defendants' Motion for Summary Judgment, docket no. 13. Plaintiff Tim Paterson has failed to provide evidence that statements in Sir Harold Evans' chapter on Gary Kildall are provably false or defamatory. The statements in the Kildall

ORDER   33–

1   chapter constitute non-actionable opinion protected by the First Amendment, or statements

2   that are not provably false.  In addition, as a limited purpose figure Mr. Paterson has failed to

3   provide any evidence that Sir Harold Evans acted with actual malice.  The Court grants the

4   Defendants' Motion for Summary Judgment, docket no. 13, on each of Plaintiff's claims.

5

6          IT IS SO ORDERED.

7          DATED this 25th day of July, 2007.

8

9          _____
           Thomas S. Zilly
10         United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER   34–